# IN THE SUPREME COURT OF IOWA

No. 21–1891

Submitted April 4, 2024—Filed May 31, 2024

**STATE OF IOWA,**

> Appellee,

vs.

**LASONDRA A. JOHNSON,**

> Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Joel A. Dalrymple, Judge.

The defendant seeks further review of the court of appeals ruling that affirmed the district court's conviction and sentence for assault causing injury.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

McDermott, J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Mary K. Conroy (argued), Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Bridget A. Chambers (argued), Assistant Attorney General, for appellee.

**MCDERMOTT, Justice.**

The State charged Lasondra Johnson with first-degree murder stemming from a series of events that resulted in Johnson shooting and killing Jada Young-Mills. Johnson claimed she shot Mills in self-defense. As part of her defense, Johnson argued that her actions were justified under Iowa's "stand your ground" law, which modifies the usual requirement that a person facing an imminent threat must retreat, if possible, before resorting to the use of force. Iowa Code § 704.1(3) (2020). Under this law, people need not retreat from a place before using force if they are lawfully present and are not engaged in illegal activity. The jury acquitted Johnson of first-degree murder but found her guilty of the lesser included offense of assault causing serious injury.

Johnson appealed, arguing that the district court erroneously instructed the jury on the stand-your-ground defense and a related instruction on the presumed reasonableness of using deadly force. She argues that there was no evidence to support an instruction to the jury that she was engaged in a separate illegal activity—assault—at the time of the shooting. Johnson also argues that at sentencing, the district court imposed an unconstitutional restitution award against her and erred in relying on improper considerations and by applying a fixed sentencing policy. The court of appeals affirmed her conviction but reversed the restitution order. We granted her application for further review.

I.

Late one night in November 2020, Johnson and Christopher Harrington (a man she had dated off-and-on for about three years) drove in Johnson's SUV to visit Christopher's mother, Sherry Harrington. Sherry was staying at the home of Christopher's sister, Shara Harrington. When they arrived at Shara's house, Christopher parked along the street outside, then went inside the house while

Johnson waited in the SUV. Shara was not home, having gone to a bar with two of her friends, Gloria Boldon and Mills, earlier that evening.

About ten minutes later, Mills, Boldon, and Shara arrived together in a car. They pulled up next to Johnson's SUV so that the vehicles were parallel, with the driver's side windows facing one another. The four women spoke through open windows for several minutes. Eventually Mills, Boldon, and Shara parked their car along the street and got into Johnson's SUV.

Witnesses presented conflicting evidence at trial about what happened next. According to Shara and Boldon, the conversation in the SUV started friendly but took a turn when Johnson and Mills, who were seated next to each other in the front seat, began yelling back and forth about the quality of hair Mills had sold to Johnson for a wig. Shara and Boldon testified that Johnson pushed Mills during the argument, and the two began fighting.

Christopher testified that he, Sherry, and Shara's fourteen-year-old niece came out of the house when the fighting began. He testified that Johnson told Mills to get out of her SUV, and Mills responded, "Bitch, move me," just before Johnson pushed Mills.

According to Johnson, she asked the women to leave her vehicle three times before Mills replied, "Bitch, you gonna have to move me," prompting Johnson to lean over and open the door next to Mills. Johnson testified that Mills then grabbed her by her hair and yanked her out of the SUV. Video captured by a recording device on a neighboring house, although too distant to make out distinct movements, shows where the fight occurred and how long it lasted.

Shara testified that Johnson and Mills began fighting, pulling wigs off each other, grabbing each other, and rolling on the ground. She testified that Christopher and Sherry broke up the fight, but when Johnson got back into her SUV, a second fight broke out. Both Christopher and Johnson testified that Mills

never stopped attacking Johnson and continued to follow her when she got back in her SUV, telling Johnson that she had a gun. It was at this point, according to Johnson, that she feared for her life.

Shara then began arguing with Christopher and hit him. Shara testified that Johnson soon "came out of the top of her vehicle or the window and she shot her gun." Boldon testified similarly, stating that she and Mills had begun walking to their own cars when they heard a "pow." The niece testified that Johnson, right before shooting Mills, said, "Where your gun at now, bitch?" The bullet struck Mills in the chest.

The witnesses gave further conflicting testimony about whether Mills and Shara were following Johnson and trying to attack her in the SUV before Johnson fired the gun. The niece testified that Mills was not attempting to get into Johnson's vehicle. Christopher testified to precisely the opposite. Johnson testified that she was shoved into her vehicle by Mills and Shara, grabbed her gun from the glovebox, and shot the gun into the air without aiming, intending only to get the women to stop attacking her. She testified that after firing the gun, she went into a state of shock. Christopher entered the driver's side of Johnson's SUV and drove them away. Johnson stated that she did not know that anyone had been shot.

Law enforcement arrived shortly after the shooting, just after midnight, and attempted to give aid to Mills. Paramedics arrived and transported Mills, who was now unconscious, to the hospital. She never regained consciousness and died at the hospital. She died from a single gunshot wound to the chest.

Police officers interviewed two neighbors, Beau and Denise Olson, who witnessed the fight while outside smoking. Beau died before the trial, but Denise

testified, saying that at first, the group of people fighting were "all bunched together," but later "it did look like it was quite a few against one person." Denise testified,

> The main part that really stuck with me was whenever one of -- whoever the group was fighting, she was kind of, like, in between the sidewalk and her car, and I don't know if he was a boyfriend or a friend or whatever, but he was trying to get, like, the other group of girls off of her at the time.

Although Denise did not see a gun, she saw a flash from a gun. After seeing the flash, she and Beau went into their house and Beau called the police. Police interviewed the Olsons about thirty minutes later. Denise told officers that the group of women "kept kind of going at that one girl." Beau told the officers that the one woman kept trying to get away from the others and into her vehicle.

Johnson contacted the police around 2:30 a.m. She voluntarily came to the police station soon after, cooperated with law enforcement, and turned over the gun and magazine used in the shooting.

The State charged Johnson with first-degree murder in violation of Iowa Code § 707.2(1)(*a*), a class "A" felony. At trial, Johnson raised a stand-your-ground defense, claiming she was justified in shooting Mills and had no duty to retreat before using reasonable force because the women attacking her were trying to follow her into her vehicle and she feared for her life. The State argued that Johnson was not justified in using force because the fight was over and the women were walking away from, not toward, Johnson's vehicle.

The jury acquitted Johnson of first-degree murder and a series of lesser included offenses (second-degree murder, voluntary manslaughter, involuntary manslaughter (both the public offense and recklessness alternatives), attempt to commit murder, willful injury causing serious injury, and willful injury causing bodily injury). She was convicted of the lesser included offense of assault causing

serious injury in violation of Iowa Code § 708.2(4), a class "D" felony. The district court sentenced her to five years in prison, ordered her to pay a fine, and awarded $150,000 in restitution to Mills's estate. The court of appeals affirmed her conviction but vacated the district court's award of $150,000 in victim restitution because the jury's verdict lacked a finding that the assault caused Mills's death. We granted further review.

II.

Johnson argues that the jury instructions failed to correctly instruct the jury on her justification defense. The instructions were misleading and confusing, Johnson argues, because there was no evidence that she was engaged in a separate assault at the time she fired the gun and thus no "illegal activity" that permitted the jury to reject her stand-your-ground defense and deadly force presumption. Johnson also argues that the district court imposed an unconstitutional restitution award totaling $150,000 and erred in sentencing her by relying on improper considerations and by applying a fixed sentencing policy.

We first address Johnson's challenge to the jury instructions. An error in a jury instruction does not warrant reversal unless it prejudiced the complaining party. *State v. Hanes*, 790 N.W.2d 545, 548 (Iowa 2010). Prejudice results, and reversal is required, "when jury instructions mislead the jury or materially misstate the law." *State v. Benson*, 919 N.W.2d 237, 241–42 (Iowa 2018). "[T]he court's instructions must convey the applicable law in such a way that the jury has a clear understanding of the issues it must decide." *State v. Davis*, 951 N.W.2d 8, 17 (Iowa 2020) (quoting *Thompson v. City of Des Moines*, 564 N.W.2d 839, 846 (Iowa 1997)).

Johnson argues that the court erred in two instructions in particular: Instructions 55 and 58. Instruction 55 stated:

If any of the following is true, the defendant's use of force was not justified:

1. The defendant did not have a reasonable belief that it was necessary to use force to prevent an injury or loss.
2. The defendant used unreasonable force under the circumstances.
3. The defendant *was engaged in the illegal activity of Assault as defined in instruction 48 in the place where she used force*, she made no effort to retreat, and retreat was a reasonable alternative to using force.

If the State has proved any of these beyond a reasonable doubt, the defendant's use of force was not justified.

(Emphasis added.) Johnson argues that element three in Instruction 55 was erroneous because it allowed the jury to find that the firing of the gun *was itself* the "illegal activity of Assault."

Instruction 58 provided:

If you find that the defendant knew, or had reason to believe, Jada Young-Mills was unlawfully entering defendant's occupied vehicle by force at the time she used deadly force, you must presume the defendant reasonably believed that deadly force was necessary to avoid injury or risk to her life or safety.

Yet, if you find the defendant *was engaged in the crime of Assault as defined in instruction 48 was also true at the time the defendant used deadly force*, you need not presume that the defendant reasonably believed deadly force was necessary to avoid injury or risk to her life or safety.

(Emphasis added.) Johnson argues that the State presented no evidence to show that at the time she used deadly force, she was engaging in the "crime of Assault." Instruction 48, which is referenced in both challenged instructions, defined assault as "an act which was intended to cause pain or injury, which was intended to result in physical contact which was insulting or offensive, or which was intended to place Jada Young-Mills in fear of an immediate physical contact which would have been painful, injurious, insulting or offensive to her."

The justification defense is built on the notion that one is justified, and thus shouldn't be held criminally liable for, using reasonable force to protect

against an imminent threat or harm. *State v. Ellison*, 985 N.W.2d 473, 477 (Iowa 2023). Iowa Code § 704.3 provides that "[a] person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any actual or imminent use of unlawful force." "Reasonable force" is defined as "that force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss." *Id.* § 704.1(1). Deadly force is authorized only "if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat." *Id.*

The use of force is generally not justified when the person knows that she can avoid it safely by retreating or taking an alternate course. *See, e.g., State v. Lorenzo Baltazar*, 935 N.W.2d 862, 870 (Iowa 2019). But in 2017, the legislature added an exception to the duty-to-retreat provision stating that "[a] person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force." 2017 Iowa Acts ch. 69, § 37 (codified at Iowa Code § 704.1(3) (2018)). The new subsection, providing what's colloquially referred to as the "right to stand your ground," modified the usual requirement that a person facing an imminent threat must retreat if possible before using force. The statute makes clear that people need not retreat from a place where they are lawfully present and are not engaged in illegal activity before using force. *Id.*; *State v. Williams*, 929 N.W.2d 621, 637 (Iowa 2019). In other words, if a person is engaging in illegal activity or is unlawfully present, the duty to retreat remains. *Lorenzo Baltazar*, 935 N.W.2d at 870.

Instruction 55 applies language from Iowa Code § 704.1 to outline when the justification exception is unavailable. The instruction is nearly identical to

the instruction given in *State v. Ellison*, where we found no error in the instruction and affirmed the defendant's conviction. *See* 985 N.W.2d at 478–79. The only difference is that the instruction in *Ellison* did not name the illegal activity that the state claimed negated the stand-your-ground defense. *Id.* at 481. We suggested in *Ellison* that "the instructions could have been more clearly stated by not including the term 'illegal activity' at all," with the court instead simply "offer[ing] the elements of the State's proposed illegal activity [and] tying that finding directly to the viability of the stand-your-ground exception." *Id.*

Although the district court did not have our guidance in *Ellison* (which wasn't decided until over a year later) when drafting the jury instructions in this case, the district court nevertheless astutely saw for itself the benefit of specifying the underlying "illegal activity" in the stand-your-ground instruction. Instruction 55 specifies "assault" as the potential illegal activity. As a result, if the jury found Johnson was engaging in a separate assault at the time she used deadly force, the exception to her duty to retreat would not apply and Johnson's stand-your-ground defense would fail. *See id.* at 479.

Turning to Instruction 58, the first paragraph restates Iowa Code § 704.2A(1)(*a*)(1), which provides that "a person is presumed to reasonably believe that deadly force is necessary" if the person against whom force is used was attempting to unlawfully enter the defendant's occupied vehicle by force. The second paragraph restates § 704.2A(2)(*a*), which states that the reasonable-use-of-deadly-force presumption is unavailable if the defendant was "engaged in a criminal offense." In this instruction as well, the district court specified "assault" as the potential criminal offense that would negate the presumption.

A jury instruction can be erroneous if it's "misleading and confusing," even if it's "derived from an accurate statement of the law." *McElroy v. State*, 637 N.W.2d 488, 500 (Iowa 2001). "[A]n instruction is misleading or confusing if it is

'very possible' the jury could reasonably have interpreted the instruction incorrectly." *Rivera v. Woodward Res. Ctr.,* 865 N.W.2d 887, 902 (Iowa 2015) (quoting *McElroy,* 637 N.W.2d at 500). "On the other hand, if a review of the instructions 'leads to the *inevitable* conclusion that the jury *could not* have misapprehended the issue,' then the challenge is without merit." *Id.* (quoting *Moser v. Stallings,* 387 N.W.2d 599, 605 (Iowa 1986)). Put another way, the jury "instructions must convey the applicable law in such a way that the jury has a clear understanding of the issues." *Davis,* 951 N.W.2d at 17 (quoting *Thompson,* 564 N.W.2d at 846).

Johnson asserts that it was highly probable that the instructions' use of "assault" confused jurors when evaluating her stand-your-ground defense and the deadly force presumption. We review challenges to jury instructions for correction of errors at law. *State v. Mathis,* 971 N.W.2d 514, 519 (Iowa 2022). We agree that the references to "assault" in Instructions 55 and 58, without more, created a strong possibility that the jury reasonably could have interpreted the instructions incorrectly.

Based on the facts developed at trial, there are three acts by Johnson that jurors could have reasonably found met the definition of assault. First, the jury could have found that Johnson was still engaged in an assault against the other women at the time of the shooting. In other words, once the fight started, it proceeded as one continuous assault that didn't end until Mills was shot. The State, for its part, argues for this interpretation on appeal, although it didn't argue it at trial.

Alternatively, depending on which witnesses' testimony the jury believed, the jury could have found that Johnson committed a separate assault when she brandished the gun and said to Mills, "Where your gun at now, bitch?" Merely brandishing the gun could satisfy the definition of assault under Instruction 48

as an act intended to place Mills "in fear of an immediate physical contact which would have been painful [or] injurious."

Finally, the jury could have found that the assault was the shooting itself. Johnson's firing of the gun indisputably falls within Instruction 48's definition of assault. The jury ultimately convicted Johnson of assault causing serious injury, and the district court held at sentencing that *this* assault resulted in Mills's death, which led to the district court imposing the $150,000 restitution order against Johnson.

But the shooting itself may *not* constitute the "illegal activity" disqualifying Johnson from the stand-your-ground defense or the reasonable-use-of-deadly-force presumption. To do so would eviscerate both the defense and the presumption. Every time a defendant invoked the defense or presumption, the State could simply point to the use of deadly force and argue that the defendant was engaged in an assault (an "illegal activity") in the place where the defendant used force. No one who uses deadly force to defend themselves would ever be successful in a stand-your-ground defense or receive the benefit of the deadly force presumption, effectively nullifying the statute.

But this is a plausible interpretation of the instructions given at Johnson's trial. Indeed, that no assault was ongoing when Johnson fired the gun is exactly how the State urged the jury to consider the events throughout the case. During opening statements, the State told the jury that when Johnson got back in her vehicle and closed the door, the fight—and thus any ongoing assault—was over:

> The evidence is also going to show that at some point the fight was over. The evidence is going to show that there was no more physical altercation going on and that the defendant, Lasondra Johnson, was back in her vehicle. And as far as everyone else was concerned, it was done.
>
> The evidence is going to show that it was not done for Lasondra Johnson. And at that time she made the choice to reach into her

glove box, pull out her gun, aim it at Jada Mills, and pull the trigger killing her.

The State elicited testimony from its witnesses consistent with this theme. Shara testified, for instance, that "the fight was over" and that Johnson "got back in her vehicle" immediately before she fired the gun. Sherry similarly testified, "I thought the fight was over. . . . So then I turned and I headed back to the house." The State returned to this theme in its closing argument:

> And the bottom line of it is, ladies and gentlemen, no matter who was the primary aggressor in the fight, by the time the gun went off, the fight was over. They had duked it out already and everybody was walking away. Mama Sherry had already moved back up into the house, [Boldon] had turned to go to her car. Everybody assumed this fight was over. [Mills] was backing up towards the sidewalk. It was done.

The State's argument to the jury makes it even more likely that the jury considered the shooting itself as an assault that defeated Johnson's justification defense. No instruction specified that Johnson must have been committing an assault *separate and distinct from* the use of deadly force for which she claimed justification. The State notably never made the argument at trial that it now makes on appeal that Johnson's brandishing of the handgun constituted an assault under Instruction 55 or 58.

In this case, the jury had multiple possibilities of "assault" from which to choose in applying Instructions 55 and 58, "but one was legally erroneous." *State v. Ross*, 986 N.W.2d 581, 587 (Iowa 2023). Because the jury instructions failed to convey the law in such a way that the jury had a clear understanding of Johnson's justification defense, we must reverse the conviction.

## III.

We thus reverse Johnson's conviction, vacate the sentence, and remand for a new trial. Because we remand the case for a new trial, we do not address

the other issues Johnson raises on appeal challenging her sentence.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**